The opinion of the court was delivered by
Fenner, J.
-The facts of this case are undisputed. The Pacific Guano Company was a joint stock company engaged in the manufacture of guano. A majority of its stock was owned and controlled by the commercial firm of Glidden & Curtis, and John M. Glidden, the senior member of that firm, was also president of the company. The firm acted as the commercial agents of the cdmpany under a contract between the two, by which all the product of the company was consigned to the firm, which made advances thereon, and had full authority to sell, pledge and dispose of the same. The evidence makes it clear that the firm was invested with all the powers of ownership over this product and its dealings therewith were binding on the company so far as its rights in the product were concerned. These powers embraced the right to pledge the product for advances made to the firm. This is not disputed with any seriousness even in argument.
The firm in January, 1889, shipped about 1000 tons of this guano by the schooner Henry Souther, consigned to W. P. Richardson at New Orleans, under some arrangement with the latter that he was to remit to the firm $10,000 against the cargo. While the cargo was en route the firm in Boston borrowed $10,000, viz., $5000 from W. T. Glidden and $5000 from Thorndyke & Carpenter, attorneys, for which it executed separate notes to each of the lenders; and to secure the same it pledged the bill of lading of the cargo by delivering the same to W. T. Glidden, who received and held it for the benefit of both lenders.
An arrangement was then entered into between W. T. Glidden and *693 the firm of Glidden & Onrtis, by which the latter gave to the former a letter addressed to W. P. Richardson, the consignee, informing him that he borrowed this money on the bill of lading; that W. T. Glidden would forward the bill with the letter, and instructing Richardson, on receipt of same, to remit to W. T. Glidden “the $10,000 you propose to send against this cargo.”
W. T. Glidden thereupon wrote to Richardson, inclosing the bill of lading and the above letter, and requesting him to send the $10,000 as directed. Richardson, on receipt of these documents, borrowed $10,000 on pledge of the bill of lading from the New Orleans National Bank, and remitted the sum to W. T. Glidden.
The remittance was duly received by W. T. Glidden, but before he had seen or settled with Thorndyke & Clark, John M. Glidden called upon him and told, him that his firm had made arrangements with Thorndyke & Clark to wait on their loan, and instructing W. T. Glidden to apply the whole $10,000 to the payment first of his own advance on the cargo, and the remaining $5000 to taking up a prior note of the firm held by him. The relations between the parties were very intimate. W. T. Glidden was the father of John M., and Thorndyke was the legal adviser of W. T. Glidden. Trusting in John M.’s assurance of the consent thereto of Thorndyke & Clark, W. T. Glidden applied the $10,000 as directed, and surrendered both the notes held by him. Thorndyke & Clark never gave such consent, .and no part of their loan has ever been repaid.
The controversy in this case is exclusively between Thorndyke & ■Clark and the Pacific Guano Company. The New Orleans National .Bank has been paid out of the proceeds of sale of the cargo, and no other creditor is before us. There is held in the hands of the court a portion of the said proceeds of sufficient amount, which Thorn-dyke & Clark claim, by virtue of their rights as pledgees, should be applied to their debt, while the Pacific Guano Company denies that claim and asserts the right to hold said proceeds free therefrom.
On the merits, the contentions of the Pacific Guano Company are threefold :
1. That Glidden & Curtis had no authority to make the pledge.
2. That the pledge of Thorndyke & Clark has been lost, because they had parted with possession of the thing pledged.
3. That the pledge has been extinguished by payment.
*694 The first contention is not seriously urged, and is clearly overthrown by the evidence.
The second is based on Art. 3162, Rev. C. C., which declares that the pledge is destroyed unless the thing “ has been actually put and remained in the possession of the creditor, or of a third person agreed on by the parties.”
It seems to us perfectly clear that when the bill of lading was delivered to W. T. Glidden, as the common agent of himself and of Thorndyke and Clark, it operated a putting in possession of both creditors. When the bill of lading was remitted to W. P. Richardson the correspondence conclusively shows that the thing pledged was passed into his possession as a “third person agreed on by both parties.”
When Richardson pledged the bill of lading to the New Orleans National Bank, he no doubt so used the powers confided in him as to give the bank a right superior to that of the original pledgees, but the possession of the bank was still the possession of Richardson,, and did not divest any rights attaching to the thing in his hands, except so far as to subordinate them to the bank’s rights. When the bank was paid, the possession of Richardson was reinstated’ with all accompanying rights and liens.’ These propositions seem to us to be too self-evident to require further argument or illustration.
The third contention is that when'the $10,000 was remitted to and received by W. T. Glidden,’ that operated an immediate discharge of the pledge.
There can be no doubt that Glidden had authority to receive pay ment and to release the pledge: Had he, of his own motion, diverted the funds, Thorndyke & Clark would, nevertheless, have been bound by such discharge, and would have had no recourse against any one except W. T. Glidden. But when the pledgor himself steps’ in and, by false representations, induces the common agent of the pledgees to believe that one of The latter has agreed to extend his loan, and and thus secures a diversión of part'of the fund, a very different question is presented. Suppose W. T. Glidden had been the sole pledgee for the whole $10,000, and. Glidden. & Curtis had proposed to him to credit only $5000 o.n his pledge, ”and to extend his. loan for the balance, would that have extinguished the. pledge for the amount of the loan so extended? Clearly, that would have been simply a partial payment which would have extinguished the loan and pledge *695 only pro tanto. Such, we think, was precisely the effect of the transaction between Glidden & Ourtis and W. T. Glidden in so far as Thorndyke & Olark were concerned. It simply operated a partial discharge of the debt and pledge, and left it in full force for the balance. John M. Glidden himself says, in effect, that such was the intention, saying that “a further remittance was expected for the purpose of repaying the loan of Mr. Thorndyke.”
Counsel for the Guano Company insists very strenuously upon the difference in personality between the company and the firm of Glidden & Curtis, but we do not think this difference has any weight in this case. The evidence makes it very clear that the firm was vested with all the powers of the owner over this cargo and its proceeds, including the power to sell, to pledge, to receive and dispose of the proceeds. If the §10,000 had been devoted to the payment of the entire pledge, the firm might have executed a new pledge for the other debt due to W. T. Glidden, which would have bound the proceeds of the cargo, which would have left the company in the same position, practically, which it now occupies. The pledgees had no dealing and no concern with the Guano Company, but dealt and were entitled to deal solely with the firm of Glidden & Curtis, and the action of the latter, in so far as it affected this property, was the entire equivalent of the action of the company.
It only remains to refer to an exception interposed by the defendants. . ...
It appears that in making this loan Thorndyke & Gardiner intended it as an investment of certain funds held by them in a fiduciary capacity, part of which belonged to the estate of W. H. Gardiner in Boston. The transaction, however, was made in their own names as attorneys, and the note taken was payable to their order. Of course they had the right to sue on this note, here or elsewhere, in their own names, and they have done so; but, no doubt, out of abundant caution, and in order that their gestión as trustees might appear of record, they made the quite unnecessary statements that the loan was of funds held by them as trustees of one Charles Foster, and of the estate of W. H. Gardiner. On these allegations defendants base an exception to the effect that a foreign succession has no capacity to stand in judgment in this State unless represented by an administrator or executor appointed or recognized by a Louisiana court. We think that, as the loan was made by them as attorneys, *696 and the note given to them as such, they have full power to sue on it in that capacity regardless of the principals whom they represent, which is no concern of defendants.
The judge a quo ruled, on all points, in accordance with the above views.
Judgment affirmed.